UNITED STATES of America,
Plaintiff–Appellee,

v.

Claude Joseph GUAY, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Daniel GUAY, Defendant–Appellant.

Nos. 95–5829, 95–5830.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 1, 1996.

Decided March 19, 1997.

**ARGUED:** Mark Timothy Williams, Williams, Stilwell, Morrison, Williams & Light, Danville, VA, for Appellants. Joseph William Hooge Mott, Assistant United States Attorney, Roanoke, VA, for Appellee. **ON BRIEF:** Marion Lee Stilwell, Williams, Stilwell, Morrison, Williams & Light, Danville, VA, for Appellants. Robert P. Crouch, Jr., United States Attorney, Timothy Callahan, Third Year Law Intern, Roanoke, VA, for Appellee.

Before WILKINSON, Chief Judge, and RUSSELL and WIDENER, Circuit Judges.

Affirmed and remanded in part by published opinion. Judge WIDENER wrote the opinion, in which Chief Judge WILKINSON and Judge RUSSELL concur.

## OPINION

WIDENER, Circuit Judge:

Claude and Daniel Guay, both French-speaking Canadians, appeal their convictions following a three-day jury trial. The jury found each defendant guilty of one count of knowingly, intentionally, and unlawfully possessing with the intent to distribute cocaine, as a principal or as an aider and abettor, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The Guays contend that the district court erred in: (1) refusing to suppress their oral and written statements given to law enforcement officials; (2) rejecting their proposed jury instructions; and (3) allowing the prosecution to cross-examine Claude Guay with assertedly prejudicial questions. Daniel Guay also argues that the evidence was insufficient to support his conviction.

We affirm the judgment of the district court, but remand in part.

### I.

On January 26, 1995, a tractor trailer being operated by defendant Claude Guay wrecked in Pittsylvania County. The tractor trailer rig overturned during the wreck, and its cargo of watermelons spilled into the median on U.S. Route 29 between Chatham and Gretna, Virginia. When the Virginia State Police arrived, they found only Claude Guay at the accident scene. Daniel Guay, Claude's son and a passenger in the tractor trailer, had left the scene following the accident and walked more than a half mile before a state trooper found him. The trooper returned Daniel to an ambulance waiting at the scene.

During cleanup of the accident scene, eight duffel bags and a box were found, having been in the trailer underneath watermelon boxes. The bags and box contained numerous bricks wrapped in tape and black and yellow plastic. Lab testing subsequently revealed that the bricks contained 180 kilograms of 89% pure cocaine. In addition, seven of Daniel Guay's fingerprints were found on the bricks.

Both defendants sustained injuries in the accident and were taken to the Danville Regional Medical Center in Danville, Virginia. After the defendants' treatment and release, the Virginia State Police transported them to an administrative building in Chatham, Virginia. There, Special Agents Charlie W. Moore and Michael R. Bass of the Virginia State Police interviewed the defendants at 2:07 p.m. on the afternoon of the accident. Before each interview, the defendants executed written *Miranda* waiver forms printed in English.

After the interviews, the defendants were transported back to the hospital because Daniel Guay's arm, originally thought not to have been broken, was in fact broken. Leaving the hospital a second time, state troopers and agents of the Federal Bureau of Investigation (FBI) transported the defendants to the Virginia State Police post in Danville, Virginia.

Special Agent Mark L. MacKizer of the FBI interviewed Claude Guay in Danville. He first spoke with a technician in the emergency room at the hospital, who informed him that Claude was not on any narcotic or medication that would alter his judgment. Claude also executed another *Miranda* waiver form written in English before the interview. The interview began at 7:42 p.m. on the evening of the accident and lasted for approximately two hours.

After the interview, MacKizer spoke with a registered nurse at the Danville Regional Medical Center, who advised him that Claude was taking three medications: one for hypertension (which had not been given to him as a result of the accident), a non-narcotic pain killer, and an antibiotic. In addition, urine screening had been administered to Claude, and it was negative for alcohol or controlled substances.

Before trial, the defendants moved to suppress the written and oral statements given to the Virginia State Police and the FBI on the day of the accident. At a hearing on the motion, the defendants argued that their injuries, their lack of understanding of English as French-speaking Canadians, and the officers' failure to get an interpreter rendered their *Miranda* waivers and subsequent confessions involuntary. The district court found that the defendants understood English well enough to waive their rights validly. The court also concluded that the defendants' physical condition did not render their waivers invalid because the circumstances of the interviews were not so severe that the defendants' wills were overborne. Accordingly, the court denied the motion to suppress.

At trial, Claude Guay testified that he worked for Pierre Morrisette and that he had driven a load from Quebec to Miami International Airport, arriving on January 17, 1995. He stated that his broker then told him to go to Texas to pick up a load. He said he eventually arrived in McAllen, Texas, and realized he had forgotten his blood pressure medication. He said he had his son, Daniel Guay, fly to Texas with the medication.

Claude next testified that he picked up two loads of watermelons, one in Valverde, Texas, and one in Edinburg, Texas, on the way to meet his son near Houston. He said that a Mexican man approached him at a truck stop once he picked up his watermelon loads. The man allegedly told Claude he would give him $20,000 for transporting some "Mexican Smoke" to Canada. Claude said he went into the truck stop restaurant after talking with the man. He left the truck's door unlocked and ate while the man loaded the truck. He stated he did not look at what was put in the truck. He said he then picked up Daniel at another truck stop.

Claude further testified that Daniel went to check the watermelons' temperature during a fuel stop in Commerce, Georgia. Daniel asked his father about the suitcase in the back of the truck. Claude told Daniel not to worry about the Mexican suitcase. The pair purportedly continued their return trip to Canada without incident until the wreck in Virginia on January 26. Daniel Guay also testified at trial. He claimed he waited several days after he arrived in Texas before Claude met him. Daniel also stated that he used the name Mario Beaubien while he was in Texas because he did not have a license. The name appeared both in the truck's log book and on a receipt from a Texas hotel in which Daniel stayed.

Daniel further testified that when he checked the watermelons' temperature in Commerce, Georgia, he noticed the bags and looked to see what they contained. He said he did not know what was in the plastic wrapped bricks and later asked his father about the bags. Daniel stated that his father told him they were the Mexican's bags and not to concern himself with them. Daniel asserted that he never discussed the bags with his father again.

After the evidence was taken, the defendants submitted jury instructions that the court refused, including an instruction defining reasonable doubt. The court, however, did give a limited definition of the term after it gave the standard instruction as to the burden of proof and reasonable doubt. The district court also gave a willful blindness instruction over the defendants' objection.

The jury convicted both defendants on June 21, 1995. After the findings of guilt, the defendants renewed their motion of acquittal and mistrial first made during trial. On July 18, the defendants filed a motion for a new trial. Daniel Guay also filed a motion for judgment of acquittal. The district court denied these motions on September 11, 1995. The district court sentenced Claude Guay to 296 months imprisonment, five years supervised release, a $2,500 fine, and a $50.00 assessment. Daniel Guay was sentenced to 240 months imprisonment, five years supervised release, a $2,500 fine, and a $50.00 assessment.

The defendants now appeal their convictions on several grounds.

## II.

■ We first examine the defendants' claim that the district court erroneously denied the motions to suppress their statements to the Virginia State Police and FBI on grounds that they did not knowingly, intelligently, and voluntarily waive their rights under *Miranda*. We review the trial court's determination regarding voluntariness *de novo*. *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). However, the district court's pertinent findings of fact on the circumstances surrounding the confession will be accepted unless clearly erroneous. *United States v. Pelton*, 835 F.2d 1067, 1071–72 (4th Cir.1987), *cert. denied*, 486 U.S. 1010, 108 S.Ct. 1741, 100 L.Ed.2d 204 (1988).

■ Whenever a defendant is subject to a custodial interrogation, the defendant must be provided with his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Here, the government does not dispute that the defendants were in custody for purposes of *Miranda*. To determine whether the defendants voluntarily waived their *Miranda* rights, the court examines the "totality of the circumstances" in the case. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). The crucial inquiry is whether the government's agents have overborne the subject's will or have left his capacity for self-determination critically impaired. *Pelton*,

835 F.2d at 1071–72. Here, the district court found that the defendants' understood English well enough and that their physical condition was such that they might waive their rights validly. We are of opinion that these findings are not clearly erroneous.

■ In deciding whether there has been a valid waiver of the right to counsel, the court should consider the background, experience, and conduct of the defendant. *United States v. Young*, 529 F.2d 193, 195 (4th Cir.1975). Limited ability to understand English may render a waiver of rights defective. See, e.g., *United States v. Short*, 790 F.2d 464, 469 (6th Cir.1986). However, such a circumstance does not necessarily thwart an effective waiver. See *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir.1989), *cert. denied*, 499 U.S. 949, 111 S.Ct. 1419, 113 L.Ed.2d 471 (1991) (holding that defendant whose native tongue was Spanish was able to waive *Miranda* rights where he said he understood rights read to him though he spoke in broken English and lapsed into Spanish occasionally during interview).

■ The defendants argue that the officials should have located an interpreter before questioning them. The record, however, indicates that Claude Guay stated he could read English if he had his glasses. He also later demonstrated that he could write English. Because Claude did not have his glasses with him, Agent Moore read him his rights in English line by line. Claude indicated in the affirmative when asked whether he understood the rights that were read to him. When advised of his right to a lawyer, he was able to relate the term to a similar position in Canada, that of "avocat." Claude also traveled from Canada to Florida, and then to Texas, and other States, further demonstrating his ability to understand English.

Daniel Guay also indicated he understood English, if it was spoken slowly, at the outset of his interview. Further, the interviewing officer asked Daniel if he understood his rights as the officer read them individually. In each case, Daniel either responded affirmatively or received an explanation if he did not appear to comprehend. Based on the evidence at the hearing, including the record-

ed interviews of Claude and Daniel Guay, the district court's finding that the language barrier did not render the waivers defective is not clearly erroneous.

■ Nor are the district court's findings regarding the defendants' physical condition clearly erroneous. Claude was in pain during his interview and having trouble breathing. However, he never requested that either of his two interviews stop due to pain. At his first interview, he was able to answer questions and to write out his version when it was more comfortable than speaking. He was provided water and repeatedly assured that there was no hurry when he appeared to be having difficulty.

During the second interview, FBI agent MacKizer checked twice with the hospital to make certain Claude was not under any judgment-impairing medications during the second interview. MacKizer allowed Claude to eat dinner, take restroom breaks, and talk with his son. While Claude was eating, they discussed subjects unrelated to the accident.

Daniel Guay did not indicate he was in pain during his interview with Special Agent Moore. Neither Daniel nor Agent Moore were aware at first that Daniel had a broken shoulder. In addition, Daniel was able to walk over a half mile from the accident to find a phone without his injuries interfering too greatly. Like his father, Daniel never requested that the interview stop.

Although interrogation of a defendant in pain may be evidence tending to show an invalid waiver, *Mincey v. Arizona*, 437 U.S. 385, 396, 98 S.Ct. 2408, 2415, 57 L.Ed.2d 290 (1978) (defendant had gunshot wound to hip, was in intensive care, hooked to tubes in his nose and throat, and repeatedly asked for interrogation to stop), a defendant may voluntarily waive his rights even when in the hospital, on medication, or in pain. *United States v. George*, 987 F.2d 1428, 1430 (9th Cir.1993). Based on the record before us, the district court's determination that Claude and Daniel Guay's discomfort was insufficient to indicate an involuntary waiver was not clearly erroneous. Accordingly, the district court properly denied the defendants' motion to suppress their statements.

### III.

The defendants next argue that the district court erroneously refused their proposed jury instructions. They also challenge two instructions the court did give defining reasonable doubt and discussing willful blindness.

### A.

■ The defendants requested jury instructions on a variety of issues, all of which the district court refused. Denial of a requested jury instruction "constitutes reversible error only if the instruction: (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Lewis*, 53 F.3d 29, 32 (4th Cir.1995).

It is not denied that the defendants' proposed instructions were correct statements of the law. They, however, were substantially covered by other instructions the court gave to the jury, including the proposed instructions regarding the definition of "knowingly"; treating codefendants as separate defendants when evaluating the evidence; evaluating the defendants' guilt only for the crime alleged in the indictment and not placing the defendants on trial for any other acts; credibility determinations; basing a verdict only on the evidence and inferences drawn from the evidence; constructive possession; and requiring proof beyond a reasonable doubt that the defendants knowingly possessed a controlled substance with intent to distribute.

We are of opinion that the instructions given by the district court covered the case in a satisfactory manner and that it was not error to refuse the instructions offered by the defendants.

### B.

■ The district court declined to give an instruction offered by the defendant defining reasonable doubt and gave one of its own, which had been approved in other circuits. While we have disapproved attempts to de-

fine reasonable doubt, especially absent a specific request from the jury, we do not believe that the court's giving its own definition of that term and refusing the definition offered by the defendant was an abuse of discretion. In so holding, we assume that the instruction offered by the defendant was correct. See *United States v. Oriakhi*, 57 F.3d 1290, 1300–01 (4th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 400, 133 L.Ed.2d 319 (1995).

### C.

The defendant also challenges the district court's decision to give a willful blindness instruction. The district court's willful blindness instruction in this case was taken from the Eighth Circuit and used the following language:

> You may find that the defendant under consideration acted knowingly if you find beyond a reasonable doubt that the defendant was aware of a high probability that drugs were in the bags and that he deliberately avoided learning the truth. The element of knowledge may be inferred if the defendant deliberately closed his eyes to what otherwise would have been obvious to him. You may not find that the defendant under consideration acted knowingly, however, if you find that he actually believed that the contents of the bags were something other than drugs. A showing of negligence, mistake or carelessness is not sufficient to support a finding of knowledge.

This circuit approves willful blindness instructions when the jury is not permitted to infer guilty knowledge from a mere showing of careless disregard or mistake. *United States v. Mancuso*, 42 F.3d 836, 846 (4th Cir.1994). "A willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance." *United States v. Abbas*, 74 F.3d 506, 513 (4th Cir.1996) (quoting *United States v. Gruenberg*, 989 F.2d 971, 974 (8th Cir.), *cert. denied*, 510 U.S. 873, 114 S.Ct. 204, 126 L.Ed.2d 161 (1993)).

Claude and Daniel Guay's stated defense was that they did not know the bags they were transporting contained drugs, asserting a lack of guilty knowledge. Claude Guay claims he accepted $20,000 to transport, without inquiry as to the contents, several bags belonging to a man he met at a truck stop. Law enforcement officials testified that Claude said he thought the bags contained marijuana during interviews on the day of the accident, while he stated at trial that he thought they contained untaxed cigarettes. In either case, Claude asserted he never investigated his suspicions further. In addition, Daniel Guay's fingerprints were found on the cocaine bricks, yet he later claimed he dropped the subject with his father after inquiring about the bags only once. This evidence was sufficient for the jury to infer that the Guays consciously closed their eyes to their involvement in an obvious drug transaction, and supports an inference of deliberate ignorance. Thus, the court's willful blindness instruction was appropriate. Moreover, the charge given satisfies *Mancuso*'s standard. It expressly instructs the jury that a finding of "negligence, mistake or carelessness" does not justify an inference of knowledge. We are of opinion the district court did not err in giving the instruction on willful blindness.

### IV.

During cross-examination of Claude Guay, the government's attorney asked him whether he knew his employer and another truck driver were drug dealers or traffickers. Also, the government's attorney asked whether Claude knew a fellow truck driver named Marcel Pinet, and when Claude said yes, he was asked whether he knew that Pinet was involved in drug trafficking and was in federal prison in Florida on drug charges. In addition, the attorney asked Claude whether the trucking company by which he was employed had ties to Bogota, Colombia. The government further asked whether Claude might have transported U.S. currency from Canada to Florida. Defense counsel objected to some of these questions at the time and later moved for a mistrial at

the conclusion of the evidence.[1]

Subsequently, the defendants filed a motion for a new trial based on Claude's cross-examination, asserting that the government's questioning constituted prosecutorial misconduct and was designed solely to inflame the jury. The district court took evidence and heard argument on this point. At the hearing, the government introduced a sealed document that it claimed supported its inquiries. The district court denied the motion for a new trial. The defendants now claim that the government's questioning prevented them from having a fair trial. They thus claim the district court erred in denying their motions for a mistrial[2] or a new trial.

A district court's refusal to grant a mistrial will be reversed only for an abuse of discretion. See *United States v. Smith*, 44 F.3d 1259, 1267 (4th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995). Moreover, it is well-settled that the scope of cross-examination lies in the discretion of the district court. *United States v. Hall*, 342 F.2d 849, 854 (4th Cir.), *cert. denied*, 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 (1965). In addition, a defendant who chooses to testify on his own behalf subjects himself to legitimate and pertinent cross-examination to test his veracity and credibility. *United States v. Pennix*, 313 F.2d 524, 528 (4th Cir.1963). Here, the defendants disclaimed knowledge of the cocaine in their trailer, and the cross-examination of Claude Guay regarding his awareness of his associates' activities thus bore on the events and issues at trial.

A cross-examiner inquiring into specific instances of a defendant's misconduct must have a good-faith factual basis for such questions. See *Michelson v. United States*, 335 U.S. 469, 481, 69 S.Ct. 213, 221, 93 L.Ed. 168 (1948); *United States v. Lamarr*, 75 F.3d 964, 971 (4th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 358, 136 L.Ed.2d 250 (1996). We have affirmed a district court's judgment granting a writ of habeas corpus when the prosecution asked the defendant about his prior acts or convictions without a good-faith basis for the assertions. *Foster v. Barbour*, 613 F.2d 59, 60 (4th Cir.1980); *Watkins v. Foster*, 570 F.2d 501, 505–06 (4th Cir.1978). Other circuits have reached a similar conclusion concerning questions about a witness's prior convictions. *United States v. Ruiz–Castro*, 92 F.3d 1519, 1528–29 (10th Cir. 1996); *United States v. McBride*, 862 F.2d 1316, 1320 (8th Cir.1988).

Although this case does not involve Claude Guay's prior acts or convictions as such, we think the same reasoning applied in those cases should apply here. When the defendants' attorney objected to the inquiries at trial, the prosecutor stated that he had support for the questions.[3] Defense counsel did not then demand the specific basis for the questions. At the hearing on the defendants' motion for a new trial, the government submitted a sealed U.S. Customs investigative report that formed the basis for the cross-examination questions to which defense counsel so objected. The district court examined the report *in camera*. We have also reviewed this document and are satisfied that

---

1. Although they now claim the government's Bogota and U.S. currency references as error, the defendants have not favored us with any page references revealing contemporaneous objections to these questions. Nor can we locate any such objections in our own review of the record. While the government claims that trial exhibits, shipping documents admitted into evidence by the defense, support the Bogota references, it has not included them in the appendix. In any event, we conclude that the Bogota and U.S. currency inquiries did not constitute plain error and therefore will not consider them further.

Even if, by stretching, we might say an objection was lodged to the question with reference to U.S. currency, it was that the question had been asked and answered, and the district court sustained the objection.

A further claim on appeal that "the government made allegations that Claude Guay was transporting drug money from Canada to Florida" is not supported in the record.

2. The motion for a mistrial was not contemporaneous, but in the setting here that made no difference.

3. The questions we consider here are whether Claude knew his employer, Morrisette, and Pinet were drug dealing and the like, and whether Pinet was in federal prison on drug charges.

the government had a good-faith factual basis for asking its questions.[4]

■ The defendants' reliance on *United States v. Hall,* 989 F.2d 711 (4th Cir.1993), is misplaced. In *Hall,* the prosecutor displayed before the jury a written statement taken from the defendant's wife that the prosecutor knew to be inadmissible. We held that a prosecutor cannot introduce inadmissible evidence through artful cross-examination. *Hall,* 989 F.2d at 716. Here, the government possessed an official investigative report, which was filed with the court under seal, that gave the prosecutor a good-faith basis for asking the questions relating to Claude's associates. Furthermore, the defendants' asserted lack of knowledge of the drug trade rendered the evidence probative. Accordingly, we conclude that the district court was within its discretion in allowing the questioning and in refusing the defendants' motion for a new trial. But there remains the question of the *in camera* examination of the Customs investigative report. We doubt that it is proper to sustain a conviction on the basis of a paper which neither the defendant nor his attorney had an opportunity to examine. That is too close to Star Chamber. See *United States v. Truong Dinh Hung,* 667 F.2d 1105, 1108 (4th Cir.1981), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982).

We are of opinion that the district court was correct in its holding that its finding of good faith on the part of the government's attorney need not have been made contemporaneously with the cross-examination. But to base the finding on a paper which neither the defendant nor his attorney have yet seen is impermissible.

Accordingly, we affirm without qualification the convictions of both of the defendants in this case on every point raised on appeal except the cross-examination of Claude Guay, mentioned in Part IV of this opinion. If nothing else appears, we also affirm the conviction of both of the defendants on account of such cross-examination. But solely because of the question of the *in camera* ex-

amination of the Customs investigative report and because the defendants have the right to object after seeing the papers justifying the cross-examination, we remand this case to the district court with directions that it permit the attorney for the defendants to examine the redacted Customs investigative report after having been ordered by the district court to disclose the contents thereof to no one other than his client. See *Truong Dinh Hung,* 667 F.2d at 1108.

We have reviewed the Customs investigative report at length. The only objectionable questions remaining at issue are those discussed in Part IV of this opinion in footnote 3. We are of opinion, absent argument by the defendants, that the report can be redacted so as not to jeopardize any ongoing investigation yet still demonstrate the government attorney's good-faith basis for these questions. The government's objection to redaction, made at trial, is not well taken.

Although we affirm, we therefore remand this case to the district court. On remand the district court will redact the Customs investigative report and then allow the defendants to examine the Customs investigative report in redacted form.

Should the defendants, following such examination, move to vacate the convictions of the defendants on that ground alone, the district court will arrange such a hearing as it may deem appropriate, and following such hearing, either vacate the convictions and order a new trial, or deny the motion, after which the defendants may take such action as they may be so advised.

V.

■ Daniel's final contention is that the evidence was insufficient to support the verdict against him. On direct appeal, we affirm decisions questioning the sufficiency of the evidence "if there is substantial evidence, taking the view most favorable to the Government, to support ... [the conviction]." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

4. The questions regarding the status of Claude Guay's employer as a drug dealer or trafficker were supported by the investigative report, as

was the question concerning Marcel Pinet's incarceration.

Daniel Guay claims the government failed to introduce any evidence showing that he knowingly possessed the cocaine on or about January 26, 1995 with the intent to distribute it or that he was aiding and abetting one in doing such. Daniel urges that the evidence merely established that he was present in a tractor trailer containing cocaine, that he was related to someone who was transporting cocaine, and that at some point he left fingerprints on the outside wrappings of the cocaine blocks.

He relies on the case of *United States v. Townley,* 942 F.2d 1324 (8th Cir.1991). In *Townley,* the authorities raided an apartment and recovered narcotics. The defendant's fingerprints appeared on some of the tape that wrapped the narcotics. No other evidence connected the defendant with the drugs. The court held that the evidence was insufficient to support the defendant's conviction of possessing cocaine with intent to distribute. *Townley,* 942 F.2d at 1326.

 We, however, are of opinion that substantial evidence supports Daniel Guay's conviction. Unlike *Townley,* the government here offered corroborating evidence in addition to the fingerprints proving that Daniel had knowledge of the cocaine. Daniel initially denied knowledge of the cocaine-filled bags when he spoke with the police. Daniel and Claude's later explanation that Daniel touched the bags only when he went to check the temperature of the watermelons may well not have been believed by the jury in view of this and other evidence which tended to show the bags were located underneath watermelon boxes stacked to the ceiling about a third of the way up in the trailer. Daniel would have had to move many heavy watermelon boxes to touch the bags. One could accordingly infer that he touched the bags at or before the time when the bags were loaded between the watermelon boxes.

In addition, Daniel's explanation for his trip to the United States is questionable. The defendants testified that Daniel needed to bring blood pressure medication to his father. However, they could not explain why they did not use an overnight service to send the medicine if the medication was so critical. Nor could Daniel adequately explain why he waited in a hotel for several days before seeing his father to give him the important medicine.

After the wreck, a state trooper found Daniel walking rapidly away from the scene of the accident. He professed a need to make a phone call, but he had already passed by a store with a phone. Furthermore, Daniel used a false name on hotel records and in the truck's log book. Other corroborating evidence includes the family relationship, the large quantity of cocaine, and the conflicting statements father and son gave during their interviews on the day of the accident.

Viewing the evidence in the case in the light most favorable to the government, we are of opinion that it supports a finding that Daniel knew of the cocaine. Thus, we hold that the evidence supports the verdict.

Accordingly, the judgment of the district court is

*AFFIRMED AND REMANDED.*[5]

---

5. See *United States v. Truong Dinh Hung,* 629 F.2d 908, 931 (4th Cir.1980).