**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

WAYNE THOMAS JOHNSON,
*Petitioner-Appellant,*

v.

SIDNEY HARKLEROAD, Superintendent,
*Respondent-Appellee.*

⎫
⎬
⎭

No. 03-6620

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
Paul Trevor Sharp, Magistrate Judge.
(CA-02-398-1)

Argued: May 5, 2004

Decided: July 19, 2004

Before WIDENER and GREGORY, Circuit Judges,
and C. Arlen BEAM, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

Affirmed by unpublished opinion. Judge Gregory wrote the opinion,
in which Judge Widener and Senior Judge Beam joined.

**COUNSEL**

**ARGUED:** Ryan David Guilds, ARNOLD & PORTER, L.L.P.,
Washington, D.C., for Appellant. Clarence Joe DelForge, III, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL
OF NORTH CAROLINA, Raleigh, North Carolina, for Appellee. **ON**

**BRIEF:** Roy Cooper, Attorney General, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

GREGORY, Circuit Judge:

Petitioner Wayne Thomas Johnson ("Johnson" or "Petitioner"), a North Carolina inmate, seeks federal habeas relief, contending that his conviction and sentence were unconstitutionally imposed in violation of the Fifth Amendment. Specifically, Petitioner contends that the police obtained his confession in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny by failing to give the requisite warnings before he verbally made inculpatory statements. After unsuccessful state post-conviction relief proceedings, Petitioner filed his petition for habeas relief in the United States District Court for the Middle District of North Carolina. The district court denied the petition, and we granted a certificate of appealability to determine whether Petitioner's confession was coerced or obtained in violation of *Miranda*. Having now considered Petitioner's claim on the merits, we affirm the judgment of the district court denying habeas relief. We conclude that the decision of the North Carolina Court of Appeals was not contrary to, nor was it an unreasonable application of, clearly established federal law.

### I.

The facts found by the state trial court and adopted by the North Carolina Court of Appeals as well as the federal district court, are as follows:

On October 31, 1999 at 4:47 a.m., Detective R.M. Fuquay, of the Burlington Police Department, was dispatched to a crime scene after

the body of Harold Keith Booker (hereinafter "the deceased") was discovered near the intersection of Sidney and Queen Anne Streets in Burlington, North Carolina. Reports later confirmed that the deceased died from head and spinal cord injuries caused by a great deal of force from a very heavy object such as a bat or a shovel.

Another detective, Sergeant Tye Fowler, interviewed Vicki Sims, who had accompanied the deceased and an "older white male" in a taxi from a bar the night the deceased was murdered. She gave a description of the older man to the police and a composite sketch was drawn. Officer Avery Irby reported that a man fitting the description given by Sims had previously flagged him down not far from the crime scene, stating that he was suffering from an apparent heart attack. Officer Irby took the man, who was later identified as Johnson, to the Alamance Regional Medical Center. After discharging Johnson later that same day, the medical center sent him to Wesley Hall, a residential treatment facility for substance abuse. Two detectives went to Wesley Hall to ask if Johnson would ride with them to the Burlington Police Department for questioning.

Having agreed to accompany the officers, Johnson arrived at the police department between 9:25 p.m. and 9:30 p.m. on October 31, 1999. Prior to being interviewed, according to the testimony of Detective Fuquay, Johnson was informed that he was not under arrest and that he was "free to leave at any time." According to Detective Fuquay, Johnson explained during questioning that he did not know the deceased or anything about his death and that he had not been to any bars on the night in question.

At some point during his interactions with police, Johnson voluntarily accompanied the officers on a car trip to the City Park, the location where defendant said he had slept upon arriving in town the night before. Detective Fuquay drove an unmarked vehicle to the site as Johnson rode alongside him, unrestrained by handcuffs or other devices, in the front passenger seat while Sergeant Fowler sat in the back taking notes. Johnson first directed the officers to the underpass of I-40/I-85, explaining that he sat and drank wine at that location once he arrived in town. Johnson then pointed to B & J's Lounge where he admitted to the detectives, for the first time, that he met the

deceased. After taking this ride, Johnson and the detectives returned to the Burlington Police Department.

During the early hours of November 1, 1999, Johnson indicated that he needed his glasses and medication, which were located at the treatment center. Consequently, two detectives transported Johnson to Wesley Hall so that he could retrieve those items. On the way to Wesley Hall, Johnson voluntarily made the following statements to the detectives: that he and the deceased were in an altercation; that he was afraid for his life and was only defending himself; that "he didn't want a charge"; that "he did not want to be charged with anything more than he had to be"; and that "he didn't mean to do it." Johnson was thereafter read *Miranda* warnings at which time he provided the officers with a written statement.

Johnson was indicted on November 8, 1999 for second-degree murder in violation of N.C. Gen. Stat. § 14-17 (1999). On May 9, 2000, Johnson filed a motion to suppress the inculpatory statements he made to the detectives. At the conclusion of a two-day voir dire hearing, the trial court denied Johnson's suppression motion. On May 18, 2000, a jury convicted Johnson of voluntary manslaughter. Johnson was thereafter sentenced to 146-185 months imprisonment. The North Carolina Court of Appeals affirmed the conviction. Johnson filed a petition for discretionary review in the Supreme Court of North Carolina which was denied. Petitioner then filed a motion for appropriate relief in the Superior Court of Alamance County, which was summarily denied. Johnson filed the current petition for federal habeas review on May 21, 2002. On March 19, 2003, the district court denied Petitioner's habeas claims. We granted a certificate of appealability ("COA") to determine whether Johnson's confession was obtained in violation of the due process clause of the Fifth and Fourteenth Amendments and the privilege against self-incrimination as declared in *Miranda* and its progeny.

## II.

We review de novo the district court's denial of habeas relief based on a state court record. *Bell v. Ozmint*, 332 F.3d 229, 233 (4th Cir. 2003). Where a state court resolved the merits of a claim for post-conviction relief, federal habeas relief is not available unless the state

court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1) (2003), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

The Supreme Court has interpreted 28 U.S.C. § 2254(d)(1) as giving independent meaning to both the "contrary to" and "unreasonable application" clauses. *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). A state court decision is "contrary to" Supreme Court precedent if it (1) arrives at a conclusion that contradicts that reached by the Supreme Court on a question of law; or (2) confronts facts that are materially indistinguishable from those of relevant Supreme Court precedent and arrives at a contrary result. *Id.* at 405. A decision is an "unreasonable application" of clearly established Supreme Court law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413. "[C]learly established Federal law, as determined by the Supreme Court," refers to the "holdings, as opposed to the dicta, of [the Court's] decisions as of the time of the relevant state-court decision." *Id.* at 412.

As is well established, Johnson's burden to make such showings under § 2254 is a most demanding one. "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.'" *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam)) (internal citation omitted). With that background in mind, we turn to the merits of Petitioner's habeas claims.

## III.

### A.

We granted a COA to determine whether Johnson's confession — he gave a verbal confession prior to receiving *Miranda* warnings and

provided a more detailed written statement after being Mirandized —
should have been suppressed because it was obtained in violation of
*Miranda* and its progeny, or whether his confession was coerced or
otherwise involuntarily obtained in violation of the Fifth Amend-
ment's privilege against self-incrimination made applicable to the
States by the Fourteenth Amendment. While conceding the police
interview was initiated with his consent, Johnson maintains that the
interview was transformed into a custodial interrogation by the exten-
sive length of the interview, his lack of access to the public and a
mode of transportation, the barrage of questioning by alternating
teams of police officers, the fact that he had been photographed at
some point during his interactions with the police, and his diminished
mental state, resulting from his prior history of drug and alcohol
abuse and excessive indulgence of same several hours prior. Conse-
quently, Johnson contends he should have been given his *Miranda*
warnings prior to making his verbal confession and, thus, his entire
confession should be suppressed. He also maintains that his verbal
confession, made without the benefit of *Miranda* warnings, was
coerced and, therefore, could not constitute a voluntary waiver of his
*Miranda* rights.

A suspect is entitled to *Miranda* warnings only if he or she is inter-
rogated while "in custody." *Thompson v. Keohane*, 516 U.S. 99, 102
(1995). The Supreme Court has held that two discrete inquiries must
be conducted when determining whether a person was "in custody."
First, we must consider "the circumstances surrounding the interroga-
tion." *Id.* at 112. As this is purely an issue of fact, *see Tankleff v. Sen-
kowski*, 135 F.3d 235, 243 (2d Cir. 1998), we presume that the state
courts' findings are correct. *See* 28 U.S.C. § 2254(e)(1); *see also Yar-
borough v. Alvarado*, 124 S. Ct. 2140, 2150 (2004) (reversing court
of appeals' grant of habeas relief under 28 U.S.C. § 2254 after finding
that evidence lead to "differing indications" as to the custody inquiry
and concluding, "[t]he custody test is general, and the state court's
application of our law fits within the matrix of our prior decisions").
We then must determine whether, given those circumstances, a rea-
sonable person would have felt "at liberty to terminate the interroga-
tion and leave," which is a mixed question of fact and law. *Thompson*,
516 U.S. at 112-13.

As noted above, however, under 28 U.S.C. § 2254(d) Petitioner
must show that the North Carolina Court of Appeals' decision was

either contrary to, or an unreasonable application of, the Supreme Court's clearly established precedents. Here, in considering the "contrary to" prong of the analysis, the North Carolina state court clearly identified the applicable Supreme Court precedents and correctly recognized the governing principles of those decisions. *See State v. Johnson*, 560 S.E.2d 885 (table), 2002 WL 276219, at *2 (N.C. Ct. App. Feb. 5, 2002) (unpublished) (discussing *Miranda* and *Beckwith v. United States*, 425 U.S. 341 (1976)); *id.* (quoting *State v. Gaines*, 483 S.E.2d 396, 405 (N.C. 1997) (citing *Stansbury v. California*, 511 U.S. 318 (1994) (per curiam))); *id.* (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). In short, nowhere did the North Carolina Court of Appeals apply a legal standard contrary to that set forth by the United States Supreme Court, nor did the state court address a set of facts materially indistinguishable from those of the Supreme Court's clearly established precedents. Similarly, for the detailed reasons that follow, we conclude that the state court's decision did not involve an "unreasonable application" of clearly established federal law and thus we affirm the judgment of the district court denying Johnson habeas relief.

### B.

In order to protect the right guaranteed by the Fifth Amendment that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V, the Supreme Court in *Miranda* set forth constitutional rules that law enforcement officers must follow during custodial interrogations. 384 U.S. at 444; *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000) (holding that requirements of *Miranda* are constitutional in nature). In general, any statements elicited from a suspect in violation of these rules are inadmissible during the prosecution's case-in-chief. *Stansbury*, 511 U.S. at 322. Absent formal arrest, *Miranda* warnings only apply "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Mathiason*, 429 U.S. at 495. An individual is in custody for *Miranda* purposes when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

The *Miranda* Court defined a "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been

taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 333; *Mathiason*, 429 U.S. at 492 (duty to give *Miranda* warnings is triggered "only where there has been such a restriction on a person's freedom as to render him 'in custody'" and are not required merely because questioning occurs at a police station); *see also Stansbury*, 511 U.S. at 322-23 (police officer's subjective belief that person questioned is a suspect is irrelevant to objective "in custody" determination); *Berkemer*, 468 U.S. at 236-39 (nature of suspected offense is irrelevant to duty to administer *Miranda* warnings); *California v. Beheler*, 463 U.S. 1121, 1125 (1983) ("ultimate inquiry" is whether there was a formal arrest or restraint on freedom of movement to the degree associated with a formal arrest); *Beckwith*, 425 U.S. at 347-48 (holding the fact that an individual is the "focus" of a criminal investigation does not necessarily mean he or she is in custody). Thus, a determination of whether a person is "in custody" during police interrogation for purposes of *Miranda*, is a mixed question of law and fact. *Thompson*, 516 U.S. at 112-13. A reviewing court must look to the totality of the circumstances in determining whether a person is in custody, "but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury*, 511 U.S. at 322 (citations and internal quotation marks omitted).

## C.

Applying the legal principles discussed above, the North Carolina state courts concluded that Johnson was not in custody prior to receiving *Miranda* warnings. Specifically, the North Carolina state courts found it significant that: (1) the detectives interrogating Johnson repeatedly advised him that "he was not under arrest" and was "free to go"; (2) Johnson acknowledged that he understood these facts;[1] (3)

---

[1] Johnson argues his own understanding was immaterial because the custody determination for *Miranda* purposes is determined by a reasonable person standard, not by what the individual subjectively believed. *See infra* at 9-12. Here, however, it is clear that in the face of such repeated statements by the officers that the Petitioner was free to leave, the North Carolina state courts' conclusions that a reasonable person would have felt free to leave is well-supported.

the detectives admitted that during the early stages of the interview they had no probable cause to believe Johnson had killed the deceased and they would have allowed him to leave; (4) Johnson accompanied the detectives to the crime scene while riding in the passenger seat and was never placed in handcuffs or restrained in any other manner; (5) Johnson was allowed to leave the room in which he was being questioned to use the restroom without police accompaniment. Having reviewed the state courts' application of federal law concerning custody to these facts, we conclude that such application was not unreasonable under clearly established federal law. The purported evidence of police overreaching is insufficient for us to disturb the North Carolina Court of Appeals' determination that the voluntary interview was not later transformed into a custodial interrogation such that Johnson was not free to leave, therefore, triggering Johnson's *Miranda* rights prior to the time he was actually warned.

In *United States v. Parker*, for example, on direct review — where a more lenient standard of review is applied than on habeas review — we determined, on largely similar facts although admittedly the questioning was conducted inside the defendant's home, that a police interview did not constitute a custodial interrogation. 262 F.3d 415, 419 (4th Cir. 2001). Specifically, we wrote:

> The facts in this case do not demonstrate that Parker's freedom of action was curtailed to such a degree [associated with formal arrest]. The district court found that Parker was told she was not under arrest. She was not handcuffed or otherwise restrained, and the agents did not draw their weapons in her presence.

*Id.* We also concluded: "Custody determinations do not depend on the subjective views of either the interrogating law enforcement officers or of the person being questioned, but depend instead upon the objective circumstances of the interrogation." *Id.* (quoting *Stansbury*, 511 U.S. at 323).

In this case, we must consider the totality of the circumstances and determine whether a reasonable person would have understood him or herself to be under arrest at any time during the interview. *Id.* First, we note that the police interview was initiated with Johnson's con-

sent, and continued after police repeatedly told him that he was not in custody and thus free to leave. Johnson, nonetheless, argues that his "initial willingness to accompany the police to the station does not negate the fact that as the interrogation proceeded his objectively reasonable understanding of his personal freedom was dramatically altered." Br. of Appellant at 17 (citing *United States v. Kim*, 292 F.3d 969, 975 (9th Cir. 2002) (deciding on direct review that: "Voluntary initiation of contact with the police cannot be, under any circumstances, the end of the inquiry into whether a defendant was 'in custody' during the encounter. If an individual comes to the police station or another location and, once there, the circumstances become such that a reasonable person would not feel free to leave, the interrogation can become custodial.")). We agree that a finding that the defendant's contact with the police was voluntary *ab initio*, without more, is not the end of the "in custody" inquiry. Our inquiry, then, must focus on the police conduct after the interview was initiated.

In that vein, Johnson contends that he was objectively "not free to leave" because he was "repeatedly asked the same questions," had been "directly and consistently accused of murdering Keith Booker," had been "confronted with his past criminal history," and was "held in custody for several hours" prior to being given his first and only *Miranda* warnings. Br. of Appellant at 12.[2] At oral argument, counsel for Johnson indicated that Johnson was "in custody" at the point he was confronted with his criminal record and the allegations of eyewitnesses. To the contrary, the State argues that there was no police misconduct and that the state court's findings of fact, to which we owe great deference, clearly indicate that Johnson was free to leave. Indeed, before Johnson was advised of his *Miranda* rights, he was

---

[2]More specifically, Johnson contends that: "From the moment Mr. Johnson entered the Burlington police station, police exercised dominion and control over him." Br. of Appellant at 13. He also claims the following facts support his argument that he was in custody: he was placed in an interrogation room measuring approximately four-feet by five-feet; "teams" of detectives alternated asking him questions "at a fast and furious pace"; detectives took him to the various places he had been the night before; he was never outside of the officers' presence; they never offered to take him back to the residential treatment facility; and he "had no contact with the outside world." *Id.* at 13-14.

advised that he was not under arrest and that he was "free to leave"; he was allowed to go to the restroom unattended; he was not handcuffed or restrained in any fashion; he was transported in the passenger seat of an unmarked police car as he was taken to retrace his steps of the previous night; he would have been allowed to leave if he wanted; and Johnson acknowledged his understanding of the fact that he was not under arrest and was free to go. On this record, we find the only probative evidence of police overreaching — which is troubling, but not unconstitutional — is found in a misrepresentation made by one of the officers who indicated that the "police had an eyewitness and murder weapon implicating him in the crime." Br. of Appellant at 14 (citing J.A. at 43-44).[3] Without more, however, there is a strong objective inference that a reasonable person in Johnson's circumstances would have understood himself to be free to leave. *See e.g.*, *United States v. Howard*, 115 F.3d 1151, 1154-55 (4th Cir. 1997) (holding, on direct review, defendant driven by DEA agents to probation office and questioned there as suspect in crime was not "in cus-

---

[3]Even this misrepresentation is not as deceitful as it would first appear. Though they did not have a true "eye-witness" to the murder, the police did have a witness who had given a statement indicating that she last saw the deceased leaving a bar with an individual identified as Johnson. And, it is well-settled that police may engage in some misrepresentation without rendering a suspect's resulting confession involuntary or coerced. *See*, *e.g.*, *United States v. Braxton*, 112 F.3d 777, 783 (4th Cir. 1997) (en banc) (holding that investigator's statement "you're not coming clean . . . you can do five years because you're not coming clean," did not constitute a threat or promise); *cf. Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding interrogator's misrepresentation to suspect that his co-suspect had already confessed did not render suspect's subsequent confession involuntary); *Lucero v. Kerby*, 133 F.3d 1299, 1310-11 (10th Cir. 1998) (officer's false statement that defendant's fingerprint had been recovered at the crime scene did not render an otherwise voluntary statement involuntary); *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994) (holding officer's false statements that police had matched defendant's fingerprints to fingerprints found in victim's van and that two witnesses had identified defendant did not render defendant's confession involuntary); *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992) ("Of the numerous varieties of police trickery . . . a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary.").

tody" for *Miranda* purposes where he voluntarily agreed to accompany the officers, was not physically restrained, the officers brandished no weapons, and there was no evidence of coercion). On the facts as found by the North Carolina state courts, and in light of the fact that our holding in *Howard*, *supra*, suggests that Johnson would not prevail on direct review, surely he cannot prevail here given the deferential standard of review required by 28 U.S.C. § 2254(d).

While on a different record, a defendant's diminished mental state as a result of his or her history of excessive alcohol and drug use, his or her less than optimal familiarity with the geographic area in which discussions with police occur, his or her lack of means of transportation, and the fact that such defendant had been photographed by the police[4] might demonstrate custody, in light of the totality of the cir-

---

[4]On appeal, Petitioner argues that because the police photographed him he was in custody. We find that argument unsupported by the record. First, while Johnson alleges that he had been photographed "for purposes of identification," Br. of Appellant at 12, thus supporting the proposition that he was in custody, there is no record support for that proposition. Under North Carolina law, an individual "charged with the commission of a felony or a misdemeanor may be photographed and his fingerprints may be taken for *law-enforcement records* only when he has been: (1) Arrested or committed to a detention facility, or (2) Committed to imprisonment upon conviction of a crime, or (3) Convicted of a felony." N.C. Gen. Stat. § 15A-502(a) (emphasis added). However, the North Carolina statute also provides: "[t]his section does not prevent the taking of photographs, moving pictures, video or sound recordings, fingerprints, or the like . . . *for other evidentiary use*." *Id.* § 15A-502(d) (emphasis added). Here, the record does not contain any detail as to why Johnson was photographed, or at what point during his interactions with police his photograph was taken. Instead, there is only a stray reference to Johnson's photograph. *See* J.A. 33 (Tr. at 121, cross-examination of Detective Duquay) ("[Question]: When [Johnson] got to the station, do you know whether or not any photos were taken of him? [Answer]: I do know, because I read it in the report that Detective Poe or Parker one [sic] took a photo of him."). Thus, on this scant record evidence, we conclude that the fact that Johnson was photographed is of little import in determining whether he was in custody. Regardless, given the absence of clearly established federal law on whether the photographing of a suspect is an indicia of custody, we could not hold that the North Carolina state courts' determination was contrary to, or unreasonable under, clearly established federal law for failing to consider such evidence.

cumstances as found by the state courts in Johnson's case, these facts alone do not suggest that Petitioner was "objectively" in custody during the interview. *See Braxton*, 112 F.3d at 784-85 (finding that suspect was not in custody because he initiated the interview, was free to leave, and was not subject to any police coercion, in word or deed); *cf. Correll v. Thompson*, 63 F.3d 1279, 1290-91 (4th Cir. 1995) (confession voluntary when, although defendant had IQ of 68, he had received *Miranda* warnings in the past, was in custody only about seven hours, there was no physical coercion or deprivation, and he was not induced by promises).[5]

As we stated in *United States v. Photogrammetric Data Servs., Inc.*, 259 F.3d 229, 242 (4th Cir. 2001), *abrogated on other grounds by Crawford v. Washington*, 124 S. Ct. 1354 (2004), "[i]n sum, we are at best left with [Johnson's] after-the-fact assertion that he felt he had little or no choice but to accede to the [officers'] request for an interview, which is entitled to limited consideration given the totality of the circumstances before us. *See Braxton*, 112 F.3d at 781 ('Subsequent testimony by an accused about his prior subjective mental impressions and reactions must be carefully scrutinized, as such testimony is always influenced by his self-interest.') (internal quotation marks and alterations omitted))." Like the defendant in *Photogrammetric*, Johnson "failed to establish that the law enforcement agents were so intimidating or overpowering as to overcome his will to resist." *Id.* To the contrary, the facts as found by the state courts repeatedly reveal that Johnson was a willing participant throughout the course of his interactions with the police. Accordingly, the state court's finding that Johnson was not in custody and, therefore, not entitled to *Miranda* warnings prior to when they were given, was neither contrary to, nor an unreasonable application of, clearly established federal law.

---

[5]We note that Johnson had an extensive criminal history, which he does not deny. Like the petitioner in *Correll*, *supra*, Johnson had also been given *Miranda* warnings in the past and was, thus, more likely than not aware of his rights in this instance. Indeed, Johnson had a total of seven prior felony and thirteen prior misdemeanor convictions — both resulting in his receiving the highest prior conviction levels — according to the State of North Carolina. J.A. at 372-73.

IV.

Johnson also contends that his confession was involuntary. As discussed above, *supra* Part III.C., this claim lacks merit for many of the same reasons as his custody claim fails. The test for determining whether a statement is involuntary under the Due Process Clause "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired,'" *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)); *see also Dickerson*, 530 U.S. at 434, because of coercive police conduct, *Colorado v. Spring*, 479 U.S. 564, 574 (1987). To determine whether a defendant's will has been overborne or his capacity for self determination critically impaired, courts must consider the "totality of the circumstances," including the characteristics of the defendant, the setting of the interview, and the details of the interrogation. *Pelton*, 835 F.2d at 1071. Though an appellate court must make an independent determination on the issue of voluntariness, the trial court's findings of fact on the circumstances surrounding the confession are to be accepted unless clearly erroneous. *Id.* at 1072.

To establish that his confession was the product of police coercion, therefore, Johnson must still come forward with evidence of actual police overreaching, be it mental or physical. As we noted in *United States v. Cristobal*:

> Historically, cases of gross abuse have allowed courts to easily deem certain confessions involuntary. Undoubtedly, an accused's will may be overborne when he or she is subjected to severe physical abuse, held incommunicado and questioned for over 36 hours without sleep or rest, given "truth serums," or threatened with a loaded gun while wounded. The crucial difference between these cases and the case at hand is that Cristobal's waiver (and subsequent confession) was not the result of coercive police activity.
>
> Coercive police activity is a necessary predicate to a finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.

> . . . In determining whether a defendant's will has been overborne, the Court has focused on the "crucial element of police overreaching." While each case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, "all have contained a substantial element of coercive police conduct."

293 F.3d 134, 140-41 (4th Cir. 2002) (citations omitted).

In support of his coercion claim, Johnson argues that the detectives ignored his initial statement that he did not wish to say anything concerning the deceased's death and his subsequent statement that "maybe I should stop talking and get a lawyer." These facts alone, however, do not establish coercion. First, the state courts' findings clearly demonstrate that Johnson's initial equivocal statement that he did not wish to say anything was vitiated by his consistent and willing cooperation with law enforcement. Further, even if Johnson had been in custody, which he was not, the Supreme Court and this court have held that ambiguous statements regarding a lawyer like that made by Johnson are not sufficient to invoke a right to counsel. *See Davis v. United States*, 512 U.S. 452, 457-62 (1994) (holding that when an individual makes an equivocal statement such as "[m]aybe I should talk to a lawyer," officers do not need to cease questioning); *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000) (following *Davis* and holding statement, "I think I need a lawyer," is not unequivocal, and petitioner was not in custody because, *inter alia*, he was advised that he could leave any time).

For further support of his coercion claim, Johnson relies on his diminished mental capacity, a condition of which he contends the police were well aware because they had previously taken him to the hospital for an apparent heart attack, which turned out to be symptoms of excessive drug and alcohol use. The state courts' factual findings foreclose such arguments, however. *See, e.g.*, *State v. Johnson*, 2002 WL 276219, at *3 (adopting the lower court's factual finding that Johnson did not smell of alcohol and "appeared fine and normal"); *id.* (accepting lower court's finding Johnson appeared competent to the detectives, "did not have any odor of alcohol on his breath, that he was able to walk and talk properly, and that he had no difficulty in answering questions"); *State v. Johnson*, No. 99 CRS 56417,

slip op. at 2-3 ¶ 10 (N.C. Super. Ct. June 1, 2000) (finding "defendant accompanied the officers freely and voluntarily down a set of stairs, that he had no problem walking and had no problem getting in the car; that when he talked to [the detectives], that the defendant was rational, that he had a normal tone of voice . . . and that he had no problems understanding the questions and responded appropriately"); *id.* at 3 ¶ 13 (finding defendant walked and talked properly and answered questions without difficulty); *id.* ¶ 17 (finding "there was still nothing out of the ordinary about defendant's appearance and demeanor").

Thus, the state courts' findings demonstrate that evidence of coercion in this case falls far short of the facts at issue in *Cristobal*, where we found that even the fact that the defendant had been given pain killers and narcotics such as morphine was "not enough to render his waiver involuntary." 293 F.3d at 141. In that case, we acknowledged: "In making a determination on whether one's will has been overborne, we certainly must take into consideration 'the characteristics of the defendant.'" *Id.* (quoting *Pelton*, 835 F.2d at 1071). However, we concluded that "a deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment) is not, without more, enough to render a waiver involuntary." *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986)). Here, in light of the state courts' myriad factual findings regarding Johnson's apparent competency, we find no evidence of unconstitutional coercion. The state record cannot support a claim that law enforcement officials exploited Johnson's weakened condition with coercive tactics. *See Connelly*, 479 U.S. at 165.

Like the defendant in *Cristobal*, Johnson "'never requested not to be interviewed due to pain'" or due to his mental state. *Cristobal*, 293 F.3d at 141 (quoting *United States v. Guay*, 108 F.3d 545, 550 (4th Cir. 1997)). Likewise, "[n]o officer harmed or threatened to harm Cristobal if he did not" confess. *Id.* In fact, the police "did not pressure [Johnson] in any way", *see id.*, to make his oral confession. Rather, the officers were "careful to 1) ensure that [Johnson] was alert before speaking with him, 2) introduce [themselves to Johnson] and advise [him] of the nature of the investigation, 3) read [Johnson] his *Miranda* rights [before formally arresting him], and 4) make sure, even after the waiver, that [Johnson] was in fact a willing participant."

*Id.* Thus, under *Cristobol*, the conclusion is inescapable that "[t]his is simply not a case where law enforcement has attempted to 'wring[ ] a confession [or Miranda waiver] out of an accused against his will.'" *Id.* (quoting *Blackburn v. Alabama*, 361 U.S. 199 (1960)) (alterations in original).

Based on our review of the record, we conclude the North Carolina Court of Appeals' determination that Johnson's confession was not the result of unconstitutional police coercion is neither contrary to, nor an unreasonable application of, clearly established federal law. We do not find, as Johnson asserts, that his will was overborne by the circumstances of the police station interview.

## V.

For the foregoing reasons, we affirm the district court's denial of Johnson's habeas petition.

*AFFIRMED*